**SO ORDERED: January 10, 2025.**



**Jeffrey J. Graham**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| STEVEN MARK DALTON, | ) | Case No. 22-4872-JJG-7A |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| THE RETIREMENT GROUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 23-50012 |
| | ) | |
| STEVEN MARK DALTON, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING PLAINTIFF'S**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

This matter comes before the Court on the *Motion for Summary Judgment* (the "Motion") filed by Plaintiff The Retirement Group, LLC ("TRG") on its *Complaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. § 523(a)(6)* (the "Complaint") against Debtor/Defendant Steven Mark Dalton ("Dalton"). For the reasons stated below, the Court **GRANTS** the Motion.

## STATEMENT OF UNDISPUTED FACTS

1. TRG was a registered investment advisor with the Securities and Exchange Commission.

2. Through its affiliated investment advisors, TRG provided asset management services to wealthy retirees.

3. Ardent Retirement Planning, LLC ("Ardent") was a competitor of TRG.

4. To trade securities on behalf of clients, investment advisors use the services of registered broker dealers. TRG's broker dealer was First Securities Corporation; Ardent's broker dealer was Securities America, Inc. ("SAI"). John Jastremski ("Jastremski") owns TRG, while Dalton was the head of Ardent and principal of SAI.

5. TRG compiled a proprietary database of prospects and reached out to them through advertising and seminars.

6. TRG's client database included extensive personal information to allow TRG to effectively serve its clients' needs and enable its investment advisors to build client relationships and retain clients.

7. TRG's client database was the result of substantial time, expense and effort, including research, cold calls, personalized phone calls, targeted email, mail marketing, seminars, personal meetings, and referrals.

8. TRG spent over two million dollars per year on its marketing and client service efforts.

9. TRG took extensive security measures to keep its client database confidential.

10. TRG's client information was not accessible to the public or generally known to others in the industry, and there was no public directory or readily available list containing the database contents.

11. To obtain access to TRG's client database, individuals were required to sign documents that prohibited disclosure of the information. Access to the client database required a username and password, which was issued by TRG. Before an individual was able to access the database, they were confronted with a "splash screen" which they were required to acknowledge and which included statements about confidentiality and the restrictions on the use of the information accessed.

12. TRG's client information had potential economic value because a competitor could use it to direct sales efforts to the current/prospective clients who would retire soon, were likely to use the services of a financial advisor, and represented the top 1-5% of employees at an employer.

13. Rather than develop a client database through his own hard work, Dalton planned to simply take TRG's client information.

14. Dalton, Ardent, and Lloyd Silvers ("Silvers") (together, the "Ardent Group") solicited TRG's investment advisors to move to Ardent and take TRG's client information with them.

15. Dalton had TRG's former employees, including Silvers, download TRG's proprietary information before their departures.

3

16. In 2013, Silvers left TRG to join Dalton and a group of investment advisors who eventually formed Ardent.

17. In October or November of 2014, Jeremy Keating, Richard P. Gigliotti, and Alexander J. Mele (together, the "Keating Group") struck a deal with Ardent's broker dealer, SAI. Although the members of the Keating Group were preparing to leave TRG in the spring of 2015, they were terminated by TRG on January 10, 2015, when TRG discovered they were connected to suspicious downloads of TRG data. Accordingly, the members of the Keating Group transferred to Ardent and SAI in January 2015.

18. On January 12, 2015, the Keating Group filed a complaint against TRG and Jastremski in the District Court for the Southern District of California (the "District Court Case" and the "District Court" respectively). By way of the District Court Case, the Keating Group sought a declaratory judgment because they feared TRG would sue them for misappropriation of trade secrets and obtain a preliminary injunction against them arising from their departure.

19. On December 28, 2016, TRG and Jastremski filed a counterclaim in the District Court Case against the Ardent Group, the Keating Group, SAI, and others for misappropriation of trade secrets and other tort and contract claims.

20. On May 12, 2017, after more than two years of litigation, TRG and Jastremski moved for terminating sanctions contending that the Ardent Group, the Keating Group, and SAI had engaged in discovery abuses, perjury, and destruction of evidence.

4

21. On June 27, 2018, the District Court appointed The Honorable Ronald S. Prager (Ret.) as Special Master (the "Special Master") pursuant to Rule 53 of the Federal Rules of Civil Procedure to prepare a report and recommendation regarding the request for terminating sanctions.

22. The Special Master held a six-day evidentiary hearing, at which the Ardent Group had the ability to testify and put forward evidence, including Dalton's testimony.

23. During the proceedings, the Keating Group and SAI settled and were dismissed, and only TRG's request for sanctions against the Ardent Group remained at issue.

24. After considering voluminous briefing, evidence, including live testimony, and extensive argument, the Special Master submitted his report and recommendations in which he concluded that the Ardent Group intentionally and maliciously destroyed evidence and recommended that the District Court grant TRG's motion for terminating sanctions and strike the Ardent Group's answers.

25. By Order dated April 9, 2020 (the "Terminating Sanctions Order"), the District Court: (1) adopted the Special Master's Report and Recommendation, (2) granted the motion for terminating sanctions, and (3) directed the Clerk to strike the strike the Argent Group's answers to TRG's counterclaim and enter a default against them.

26. Significantly, the District Court specifically adopted the Special Master's findings that: (1) the Ardent Group formed a deliberate plan to destroy

5

evidence in anticipation of litigation; (2) the Ardent Group deleted or caused the deletion of extensive electronic evidence, including metadata; (3) on August 4, 2015, shortly before TRG's opposition to the Keating Group's motion for summary judgment was due, Dalton and Silvers caused the destruction of an office assistant's hard drive to prevent her from providing incriminating evidence to TRG and Jastremski; (4) due to the Ardent Group's destruction of relevant evidence and stonewalling of discovery requests the District Court Case was bogged down in discovery for years and was impossible to move forward to trial.

27. The District Court concluded that, based on the forensic experts' uncontroverted testimony, much of the electronic data had been irretrievably destroyed.

28. The District Court found that the Ardent Group intentionally destroyed evidence in anticipation of and during litigation with knowledge that the evidence may be potentially relevant to TRG's prosecution of its counterclaims against the Ardent Group. The District Court further found that those actions made it impossible to determine the relevancy of that evidence with any certainty.

29. The District Court further found that the Ardent Group's spoliation of evidence was committed in bad faith and with the intent to thwart TRG's presentation of its case and thus undermine the integrity of judicial proceedings.

30. The District Court also found that in addition to the destruction of evidence, the Ardent Group's repeated failure to comply with discovery requests, and the Magistrate Judge's discovery orders, repeated failure to timely pay

sanctions related to discovery misconduct, and the entry of a contempt order against Ardent Group related to discovery misconduct independently prejudiced TRG's ability to go to trial causing extensive and needless delay of the proceedings, causing TRG to incur attorneys' fees , depriving it of relevant discovery, and ultimately, of probative evidence, thus threating to interfere with the rightful decision of this case.

31. In light of the record of protracted, deliberate, and egregious misconduct, the District Court concluded that that entering a default against the Ardent Group members was the only appropriate sanction.

32. Consistent with the Terminating Sanction Order, the Clerk entered a default as to the Ardent Group on April 9, 2020.

33. That same day, TRG filed an amended counterclaim (the "Amended Counterclaim) against the Ardent Group asserting, among others, a claim for misappropriation of trade secrets under California law.

34. As a result of the entry of default, the Ardent Group was deemed to have admitted the factual allegations in the TRG Counterclaim, except those related to damages.

35. On May 8, 2020, TRG filed its motion for default judgment (the "Default Motion") against the Ardent Group on the Amended Counterclaim.

36. On July 23, 2020, counsel for Dalton and Ardent filed a response in opposition to the Default Motion.

7

37. Neither Dalton nor the other members of the Ardent Group requested a hearing on damages in connection with Default Motion.

38. On March 30, 2021, the District Court granted the Default Motion and entered a judgment (the "Judgment") in favor of TRG and against Dalton awarding TRG $745,983.43 in unjust enrichment, $50,000 in punitive damages; and $764,547.72 in attorneys' fees and costs. The Judgment also enjoined Dalton, Ardent, and Silvers from using TRG's trade secrets TRG's information on current and prospective clients misappropriated from its database.

39. In awarding punitive damages, the District Court specifically concluded that that Dalton's conduct was "willful and malicious" under California's misappropriation of trade secrets statute. More specifically, the District Court found that: (a) Dalton and Silvers intended to obtain TRG's trade secrets for their use through a prolonged, covert operation; (b) Dalton and Silvers assisted in the downloading of data from TRG's database, and it was slowly transferred to Ardent's database; (c) TRG spent significant resources gathering its trade secrets and, instead of doing the same, Dalton and Silvers planned to simply take it from TRG; (d) Dalton—as Ardent's manager—oversaw the entire misappropriation; (e) it was unreasonable for Dalton and Silvers to obtain TRG's trade secrets through theft; (f) Dalton's and Silver's actions were not done in good faith and they did not argue that their actions were unintentional; and (g) an ordinary person would look down at their conduct because a prolonged course of thievery is despicable conduct.

40. On April 27, 2021, Dalton filed a motion to alter or amend the Judgment and, on May 19, 2021, a response in support.

41. On November 8, 2021, the District Court denied Dalton's motion to alter or amend the judgment, in part because Dalton was "mere[ly] seeking to relitigate issues."

42. On December 6, 2022, Dalton filed a voluntary petition under Chapter 7 of the Bankruptcy Code.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(I). The parties have both consented to the Court's entry of a final judgment and orders.

## SUMMARY JUDGMENT STANDARD

To obtain summary judgment, TRG must show that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed R. Civ. P. 56(a). The burden rests on TRG, as the moving party, to demonstrate that there is an absence of evidence to support the case of Dalton, the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Assuming TRG demonstrate the absence of a genuine issue for trial, the responsibility shifts to Dalton to "go beyond the pleadings" to cite evidence of a genuine issue of material fact that would preclude summary judgment. *Id*. at 324. If Dalton does not come forward with evidence that would reasonably permit the Court to find in his favor on a material issue of fact (and if the law is with TRG), then the Court must enter

9

summary judgment against Dalton. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Celotex*, 477 U.S. at 322–24; and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–52 (1986))

## DISCUSSION AND DECISION

By way of its Complaint, TRG seeks to have Dalton's indebtedness under the Judgment deemed nondischargeable pursuant to 11 U.S.C. § 523(a)(6) as a "willful and malicious injury." TRG argues in the Motion that the Judgment preclusively establishes the elements of § 523(a)(6) and that TRG is therefore entitled to judgment in its favor as a matter of law. For the reasons stated below, the Court agrees.

### Section 523(a)(6)

To state a claim under § 523(a)(6), a creditor must prove by preponderance of the evidence that the debt in question was caused by a "willful and malicious injury." *First Weber Group, Inc., v. Horsfall (In re Horsfall)*, 738 F.3d 767, 774. "[O]nly acts done with the actual intent to cause injury" come within the scope of § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). For purposes of § 523(a)(6), "injury" means "the violation of another's legal right or the infliction of an actionable wrong." *Mut. Mgmt. Servs., Inc. v. Fairgrieves (In re Fairgrieves)*, 426 B.R. 748, 757 (Bankr. N.D. Ill. 2010). "Injuries contemplated by § 523(a)(6) are not confined to physical damage." *Nicholas & Assocs., Inc. v. Morgan (In re Morgan)*, Case No. BR 09 B 42248, Adv. Pro. No. 10 A 00253, 2011 WL 3651327, at *7 (Bankr.

10

N.D. Ill. Aug. 18, 2011). An injury to intangible financial interests also meets the requirement. *See, e.g., Oberg v. Chrispin (In re Chrispin)*, Case No. 10 B 47833, Adv. Pro. No. 11 A 00443, 2012 WL 3126807, at *15–17 (Bankr. N.D. Ill. July 31, 2012) (holding debt nondischargeable under § 523(a)(6) where defendant knowingly acted to cause financial injury to plaintiff without just cause or excuse).

The Seventh Circuit has further specified "that a willful and malicious injury, precluding discharge in bankruptcy of the debt created by the injury, is one that the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act." *Jendusa–Nicolai v. Larsen*, 677 F.3d 320, 324 (7th Cir. 2012).

## Collateral Estoppel

Under federal common law, collateral estoppel, or issue preclusion, "applies to prevent relitigation of issues resolved in an earlier suit." *Adams v. City of Indianapolis*, 742 F.3d 720, 736 (7th Cir. 2014). Under the federal standard, issue preclusion has the following elements: (1) the issue sought to be precluded is the same issue as an issue in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom estoppel is invoked must have been represented in the prior action." *Id.* TRG bears the burden of establishing that the doctrine applies and must demonstrate with clarity and certainty the District Court's determinations in the prior proceedings are entitled to preclusive effect. *See Jones v. City of Alton, Ill.*, 757 F.2d 878, 885 (7th Cir. 1985).

11

The Court readily concludes that the District Court's rulings preclude Dalton from relitigating whether his debt to TRG arises from a "willful and malicious injury." In addressing TRG's request for punitive damages under the California Trade Secrets Act, California Civil Code § 3426.3(c), the District Court offered the following:

> The Court must first determine whether Silvers and Dalton were willful and acted with malice when they misappropriated TRG's trade secrets. "Willful" means the person acted with a purpose or willingness to commit the act or engage in the conduct in question, and the conduct was not reasonable under the circumstances at the time and was not undertaken in good faith. *Ajaxo Inc. v. E\*Trade Grp. Inc.*, 135 Cal. App. 4th 21, 67 (2005). "Malice" means that the person acted with an intent to cause injury or that their conduct was despicable and was done with a willful and knowing disregard for the rights of others when they are aware of the probable consequences of their conduct and willfully and deliberately fails to avoid those consequences. *Id.* "Despicable conduct" is conduct so vile that decent people would despise and look down at it. *Id.*; *see also* California Civil Jury Instruction 4411.
>
> Here, TRG has shown – through clear and convincing evidence – that Dalton and Silvers were willful and malicious. Dalton and Silvers intended to obtain TRG's trade secrets for their use through a prolonged, covert operation. They assisted in the downloading of data from TRG's database. That data was slowly transferred to Ardent's database. TRG spent significant recourses on gathering its trade secrets. Instead of doing the same, Dalton and Silvers planned to simply take it from TRG. Dalton and Silvers do not argue their actions were unintentional. It was also unreasonable to obtain a company's trade secrets through theft. Their actions were not done in good faith.
>
> An ordinary person would look down at their conduct. *Ajaxo Inc.*, 135 Cal. App. 4th at 67 (it is reasonable to conclude a prolonged course of thievery is despicable conduct).

*Judgment* at pp. 11-12.

While the definitions for "willful and malicious" under the California Trade Secrets Act are not identical to those used under § 523(a)(6), they do encompass the same types of conduct, *i.e.*, an unreasonable act taken in bad faith that was

12

intended or likely to cause injury. As such, the Court readily concludes that the issues faced and decided by the District Court are the same issues presented in this proceeding. Additionally, the District Court's findings were essential to its conclusions and ultimate judgment. Finally, the record reflects that Dalton was represented by counsel throughout the District Court Case.

Dalton himself seemingly concedes that the Judgment is entitled to preclusive effect under the federal common law standard But while federal common law generally determines the preclusive effect of a federal court judgment, *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008), Dalton urges the Court to instead apply California's standard for collateral estoppel.

In support, Dalton directs the Court to a modest line of cases that holds that the applicable state standard for collateral estoppel should apply to a federal judgment where the federal court exercised its supplemental jurisdiction over state law claims. *See, e.g., In re Adamo*, 560 B.R. 647 (Bankr. E.D.N.Y. 2016) ("When a federal court reviews the preclusive effect of state law claims decided by a federal court exercising supplement jurisdiction under 28 U.S.C. § 1367 in a federal question case, the reviewing court applies the law of the state in which the federal court exercising supplemental jurisdiction sat."). *See also Hately v. Watts*, 917 F.3d 770. 777 (4th Cir. 2019).

13

While there is case law to this effect within other circuits, the Seventh Circuit has yet to squarely address the issue, and the Court finds it unnecessary to do so here, as the Court reaches the same conclusion under either standard.[1]

The threshold requirements for collateral estoppel under California's standard do not materially differ from the federal common law standard cited above:  For collateral estoppel to apply under California law: (1) the issue sought be precluded from relitigation must be the identical issue to that decided in the former proceeding; (2) This issue must have been actually litigated in the former proceeding; (3) it must have been necessarily decided in the former proceeding; (4) the decision in the former proceeding must be final and on the merits; and (5) the party against whom preclusion is sought must be the same party as, or in privity with, the party to the former proceeding.  *See, e.g., In re Plyam*, 530 B.R. 456, 462 (B.A.P. 9th Cir. 2015 (*citing Lucido v. Superior Ct.*, 795 P.2d 1223 (Cal. 1990)).

But in addition to these threshold requirements—and unlike the federal standard—California has also adopted an additional factor that looks to whether the application of collateral estoppel in a given case serves the public policies of promoting judicial economy by minimizing repetitive litigation, preventing inconsistent judgments which undermine the integrity of the judicial system, and protecting against vexatious litigation.  *Id.*; *In re Baldwin*, 249 F.3d 912 (9th Cir.

---

[1] The Court notes that the Default Judgment is currently pending on appeal and while Dalton does not contend that the pending appeal precludes the application of collateral estoppel, the Court makes clear that it does not. *See Prymer v. Ogden*, 29 F.3d 1208, 1215 n. 2 (7th Cir. 1994); *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 500 F. Supp. 2d 864, 868 (N.D. Ill. 2007) (citations omitted).

14

2001). Dalton describes this factor as "an escape valve for courts faced with a case that technically meets the threshold factors for an application of collateral estoppel but for which a court should not apply the doctrine because of unique factors, such as a judgment that undermines the integrity of the judicial system."

Dalton contends that unique factors are present here in light of his original counsel's failure "to fulfill his obligations to Dalton in an egregious way" such that Dalton was allegedly denied "a full and fair opportunity" to defend himself. In this same vein, Dalton also suggests that he and his subsequent counsel were "ambushed" when his co-defendants settled just before the conclusion of the terminating sanctions hearing which left him and his substitute counsel unprepared to provide a defense and left Dalton and Silvers "holding the bag."

In support of this claim, Dalton directs the Court to a February 4, 2019 order issued by the Special Master that details former counsel's various failings. But in the Court's view, this order actually cuts *against* Dalton's argument in that it demonstrates that despite being fully cognizant of counsel's failings, the Special Master still found good cause to recommend a terminating sanction to the District Court.

In the Court's view, Dalton's allegations against his original counsel are better addressed in his appeal to the Ninth Circuit or in a separate action against counsel for damages. The allegations do not, however, provide a sufficient basis to forego the application of collateral estoppel here. *See In re Sanga*, 644 B.R. 843 (Bankr. C.D. Cal. 2022) (counsel's malpractice or negligence is not a basis to decline

15

to apply collateral estoppel). Allowing Dalton to relitigate these issues would not promote any of California's policy concerns and would instead undermine public confidence in the judicial system.

The Court has no concern about California's policy imperatives here. After considering the extensive evidence gathered by the Special Master, the District Court found good cause to enter a terminating sanction. In reaching that decision, the District Court specifically found that Dalton and his co-defendants had intentionally stolen valuable proprietary information from TRG and then intentionally destroyed evidence of the theft. Dalton fully participated in the Special Master's lengthy evidentiary hearing, had counsel present, and was able to present testimony. With the assistance of counsel, he was also able to defend, and did in fact defend, against TRG's motion for a default judgment.

The Court further notes that the Judgment is no garden variety default judgment. Unlike most default judgments entered after the mere failure to file an answer or otherwise appear in defense of an action, the evidentiary record developed by the District Court here is extensive as to both the destruction of evidence and the underlying conduct at issue in TRG's counterclaims against Dalton and the rest of the Ardent Group. The Court can find no equitable basis to expend additional judicial resources relitigating these issues given the District Court's extensive factfinding.

16

## CONCLUSION

For these reasons, the Court finds the application of collateral estoppel to be appropriate here under both the federal common law and California standards. The Court therefor **GRANTS** the Motion and holds that the District Court's rulings in both the Terminating Sanction Order and Judgment preclusively establish that Dalton's indebtedness to TRG arose from a 'willful and malicious injury." The Court will issue a judgment consistent with this holding contemporaneously herewith.

###